NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

KENWORTH LAURIER,

    Plaintiff,

v.

STEPHEN D'ILIO, et al.,

    Defendants.

Civil Action No. 15-6043 (BRM)

OPINION

**MARTINOTTI, DISTRICT JUDGE**

Before this Court is Defendants Stephen D'Ilio ("D'Ilio"), George O. Robinson ("Defendant Robinson"), Senior Corrections Officer N. Wright, Senior Corrections Officer T. Wilson, and Sargent R. DeLaRosa (collectively, "Defendants") Motion to Partially Dismiss *pro se* Kenworth Laurier's ("Laurier") Complaint as to the official capacity claims for damages against all Defendants and to dismiss the Complaint in its entirety against D'Ilio and Robinson. For the reasons explained below, the Motion to Dismiss is **GRANTED** in part and **DENIED** in part.

**I. BACKGROUND**

    **A. The Complaint**

The complaint alleges violations of the Eighth Amendment arising from prison officials' failure to protect Laurier from an assault by another inmate and Defendants' denial of medical treatment for his serious injuries following the attack. (Compl. (ECF No. 1.)) The Court recounts only the allegations relevant to the instant Motion to Dismiss, accepts the factual allegations in the Complaint as true, and draws all inferences in the light most favorable to Laurier. *See Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). Further, the Court also considers any

1

"document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1426 (3d Cir. 1997) (emphasis in original).

Laurier, who is gay, was previously assigned to a "single-man cell," but was later reassigned to a two-person cell on July 1, 2013, by order of the SID[1], which is overseen by D'Ilio. (ECF No. 1 ¶ 10, 12-13.) However, the Institutional Classification Committee ("ICC") generally makes decisions about prisoner housing and is overseen by Defendant Robinson (*Id.* ¶ 12.) Prior to his placement in the double cell, "no screening was done by SID or ICC to ensure that Laurier and his cellmate would be compatible. Specifically, no process was in place to identify gay and homophobic inmates and to keep them separate." (*Id.* ¶ 13.) Laurier and his first cellmate had no issues, but that cellmate was transferred in July or August 2013. (*Id.* ¶ 14.)

However, Laurier's second cellmate, Inmate Robinson confronted Laurier about his homosexuality, which Laurier did not deny. (*Id.* ¶¶ 15-17.) Although Inmate Robinson initially displayed no animosity toward Laurier, he began to make repeated requests to Wright and Wilson to be reassigned. (*Id.* ¶¶ 18-19). In the middle of August 2013, Inmate Robinson told Wright that Laurier "would have physical problems" if Inmate Robinson was not reassigned to a new cell, but Wright ignored Inmate Robinson's threats. (*Id.* ¶ 19.) On the day of the attack, Inmate Robinson again asked Wright to move him from the cell, and warned that "it's going to turn physical," but Wright ignored Inmate Robinson's threats and told him "to do what you got to do." (*Id.* ¶¶ 21-22.) Inmate Robinson then stormed back to the cell he shared with Laurier. (*Id.* ¶ 23.)

When Laurier returned from the "mess area" to his cell, he was brutally attacked by Inmate Robinson. (*Id.* ¶¶ 26-33.) Just prior to the attack, Inmate Robinson heated a cup of boiling water with an emersion heat coil, otherwise known as a "stinger." (*Id.* ¶ 27.) Inmate Robinson threw the

---

[1] Laurier fails to define SID in his Complaint.

boiling water at Laurier. (*Id.* ¶¶ 31-32.) Inmate Robinson also punched Laurier, hit him with computer equipment, and tried to strangle him with a cable wire. (*Id.* ¶ 31.) The attack lasted fifteen minutes before a "code 33" was called.[2] (*Id.* ¶ 33.)

As of the date of the attack, general population inmates at New Jersey State Prison ("NJSP") "were permitted by [] D'Ilio" to have stingers and "[t]here was no limit on the number of stingers an inmate could possess. Nor was there any restriction [on] or supervision of an inmate's use of a stinger." (*Id.* ¶ 28.) However, inmates in more restrictive housing units were not permitted by D'Ilio to use or possess stingers. (*Id.* ¶ 29.) Inmates in other prisons were not permitted to have stingers at all during the relevant time period. (*Id.*) Despite the dangers posed by stinger, D'Ilio allowed its use and possession, while at the same time prohibiting the possession and use of commonplace items, such as pens, toothbrushes and razors. (*Id.*) On May 15, 2014, D'Ilio prohibited the use and possession of stingers. (*Id.* ¶ 30.)

After the assault, Laurier was handcuffed by order of DeLaRosa, despite the fact that he had visible burns on his hands and wrists. (*Id.* ¶ 34.) Thereafter, Laurier was transported to the prison clinic and later to an outside hospital where he was treated for burn injuries and a cut on his head. (*Id.* ¶¶ 34, 35.) On his second day at the hospital, Laurier was served with disciplinary charges stemming from the incident and placed on prehearing detention ("PHD status"). (*Id.* ¶¶ 36, 38.)

DeLaRosa requested that Laurier be placed on PHD status, and D'Ilio, who had the power to review the PHD placement, "failed to intervene" in the placement. (*Id.* ¶ 38.) Moreover, "Defendant Robinson, who was the on-call administrator on August 24, 2013, and was fully

---

[2] Laurier's screams could not be heard in the officer's booth, where Wright and Wilson were stationed, because Wright had placed a rolled up magazine in the booth's mail slot to muffle noise coming from the "mess area." (*Id.* ¶ 32.)

briefed about [Laurier's] circumstances, failed to order [Laurier's] removal from PHD." (*Id.* ¶ 39.) An inmate on PHD status is placed in solitary confinement and is only permitted to leave his cell for a ten-minute shower each day. (*Id.* ¶ 38.) The basis for Laurier's placement on PHD status was the belief that he "will attempt to harm, threaten, or intimidate potential witnesses or that the inmate will attempt to organize or encourage others" to do so. (*Id.* ¶ 39.)

Because of Laurier's PHD status he was strip-searched twice, which caused his wounds to be exposed. (*Id.* ¶ 40.) After the second strip search, Laurier was placed in a "filthy isolation cell," which was freezing cold and contained only a three-inch mat for a bed. (*Id.* ¶ 41.) Only after several hours, was Laurier given two sheets and a blanket, but no pillow. (*Id.*) Laurier had no toiletries and the toilet could not be flushed. (*Id.*) Laurier feared his wounds would become infected because during this period, his wounds were not cleaned and or bandaged, contrary to the hospital discharge orders, and he was not permitted to leave the cell for any reason. (*Id.* ¶¶ 40-43.)

The following day, at his disciplinary hearing, Laurier was found not guilty of the administrative charges against him. (*Id.* ¶¶ 42-43.) Following the not guilty finding, he was moved into a clean cell in the general population, where his wounds were cleaned and his bandages changed as directed by the hospital's discharge orders. (*Id.* ¶¶ 43-44.)

Count One of Laurier's Complaint alleges D'Ilio, as administrator of NJSP and supervisor of SID, failed to adopt a policy to identify gay and homophobic inmates and keep them separate, which led to a violation Laurier's Eighth Amendment right to be free from physical harm.[3] (*Id.* ¶ 49.) Count Two of the Complaint alleges Defendant Robinson, as chairman of the ICC, failed to

---

[3] Counts Four, Seven, and Eight allege claims under the Eighth Amendment against the non-supervisor Defendants for failure to provide medical care (Counts Four and Six) and failure to protect (Counts Seven and Eight). However, these Counts are not at issue in the instant Motion to Dismiss.

ensure Laurier was not placed in a cell with a homophobic inmate, which violated his Eighth Amendment right. (*Id.* ¶¶ 50-51.)

In Count Three, Laurier alleges D'Ilio's policy of authorizing inmates to use and possess stingers despite the unreasonable risk of danger to inmates violated his Eighth Amendment right to be free of physical harm. (*Id.* ¶¶ 52-53.) Count Five alleges D'Ilio displayed deliberate indifference to Laurier's serious medical needs when he failed to overturn Laurier's placement in PHD, thus violating his Eighth Amendment right. (*Id.* ¶¶ 56-57.) In Count Six, Laurier alleges Defendant Robinson was deliberately indifferent to his serious medical needs when he failed to request that D'Ilio overturn Laurier's placement on PHD status, thus violating his Eighth Amendment right. (*Id.* ¶¶ 58-59.)

### B. Procedural History

On August 6, 2015, Laurier filed a Complaint and application to proceed *in forma pauperis* ("IFP") (ECF No. 1.) On August 25, 2015, the Court granted Laurier's IFP application (ECF No. 3) and on April 12, 2016, screened the Complaint for *sua sponte* dismissal. (ECF No. 5) Because Laurier sued Defendants in their official and individual capacities, and sought damages and declaratory relief (ECF No. 1 ¶¶ 5-9), the Court dismissed the official capacity claims for damages against all Defendants (ECF No. 5). The Court permitted the Eighth Amendment claims to proceed. (*See id.*) On April 10, 2017, the Defendants filed a Motion to Partially Dismiss Laurier's Complaint. (ECF No. 29.) Laurier opposes the Motion. (ECF No. 30).

## II. LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences in the facts alleged in the light most favorable to the [plaintiff]." *Phillips*, 515 F.3d at

228. "[A] complaint attacked by a . . . motion to dismiss does not need detailed factual allegations." *Bell Atl. v. Twombly*, 550 U.S. 544, 555 (2007). However, the plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan*, 478 U.S. at 286. Instead, assuming the factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." *Id.* This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* (citing *Twombly*, 550 U.S. at 556). "Detailed factual allegations" are not required, but "more than 'an unadorned, the defendant-harmed-me accusation'" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citing *Twombly*, 550 U.S. at 555, 557).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

In ruling on a motion to dismiss, Courts are required to liberally construe pleadings drafted by *pro se* parties. *See Tucker v. Hewlett Packard, Inc.*, No. 14-4699, 2015 WL 6560645, at *2 (D.N.J. Oct. 29, 2015) (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972)). Such pleadings are "held to less strict standards than formal pleadings drafted by lawyers." *Id.* Nevertheless, *pro se* litigants must still allege facts, which if taken as true, will suggest the required elements of any claim that is asserted. *Id.* (citing *Mala v. Crown Bay Marina*, Inc., 704 F.3d 239, 245 (3d Cir. 2013)). "To do so, [a plaintiff] must plead enough facts, accepted as true, to plausibly suggest entitlement to relief." *Gibney v. Fitzgibbon*, 547 F. App'x 111, 113 (3d Cir. 2013) (citing *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012)). Liberal construction also does not require the Court to credit a *pro se* plaintiff's "bald assertions" or "legal conclusions." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997). That is, "[e]ven a *pro se* complaint may be dismissed for failure to state a claim if the allegations set forth by the plaintiff cannot be construed as supplying facts to support a claim entitling the plaintiff to relief." *Id.* (citing *Milhouse v. Carlson*, 652 F.2d 371, 373 (3d Cir. 1981)).

While as a general rule, a court many not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to 12(b)(6), the Third Circuit has held "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.,* 184 F.3d 280, 287 (3d Cir.1999). Specifically, courts may consider any "'document *integral to or explicitly relied upon* in the complaint . . . ." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1426 (emphasis in original).

**III. DECISION**

Defendants' Motion to Dismiss the Complaint as to D'Ilio and Defendant Robinson raises five arguments for dismissal. First, Defendants argue D'Ilio and Defendant Robinson did not have "contemporaneous personal knowledge of the ongoing discord between [Laurier] and the inmate who attacked him" and did not know of or personally acquiesce in the discord that resulted in the attack against Laurier. (ECF No. 29-1 at 7.) Second, Defendants allege that even if Defendants' approved of Laurier's placement in PHD, this fact alone does not establish a constitutional violation because Laurier does not have a constitutional right to a particular custody status. (*Id.* at 7-8.) Third, with respect to the allegation that D'Ilio permitted inmates to possess stingers, Defendants contend Laurier "failed to produce any facts to show that D'Ilio allowed inmates to possess stingers to be used as weapons or that D'Ilio had knowledge of or acquiesced in the use of stingers for such a purpose." (*Id.* at 8.) Fourth, Defendants contend Laurier's claim that he was sent to the hospital belies his claim that D'Ilio and Defendant Robinson were deliberately indifferent to his medical needs, and Laurier has not provided sufficient facts to demonstrate the Defendants interfered with his medical treatment or knew that he was not receiving the required medical treatment. (*Id.* at 9.) Finally, Defendants move for dismissal of the official capacity claims against all Defendants.[4]

Defendants seek dismissal of the claims against supervisory defendants D'Ilio and Defendant Robinson, which are based on violations of Laurier's Eighth Amendment rights to reasonable safety and adequate medical care. "The Eighth Amendment's prohibition on 'cruel and

---

[4] Because the Court, in its prior screening Order (ECF No. 5), dismissed the official capacity claims for damages as to all Defendants, and these claims remain dismissed, the Motion to Dismiss the official capacity claims for damages is **DENIED** as Moot, and the Court will not discuss it further.

8

unusual punishment' . . . imposes on [prison officials] a duty to provide 'humane conditions of confinement,'" *Betts v. New Castle Youth Dev.*, 621 F.3d 249, 256 (3d Cir. 2010) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)), and includes the rights to reasonable safety and adequate medical care.

Under the Eighth Amendment, "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 832 (quoting *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 558 (1st Cir.1988)) (ellipses omitted). "While '[i]t is not . . . every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for a victim's safety,' '[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society.'" *Hamilton v. Leavy*, 117 F.3d 742, 747 (3d Cir.1997) (quoting *Farmer*, 511 U.S. at 834). To establish a failure to protect claim, an inmate must demonstrate that: (1) he or she is "incarcerated under conditions posing a substantial risk of serious harm;" and (2) the prison official acted with "deliberate indifference" to his or her health and safety. *Farmer*, 511 U.S. at 834.

The Eighth Amendment proscription against cruel and unusual punishment also requires prison officials to provide inmates with adequate medical care. *See Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). In order to adequately plead a denial of medical care claim, an inmate must provide facts showing: (1) serious medical need; and (2) behavior on the part of prison officials that constitutes deliberate indifference to that need. *See Estelle*, 429 U.S. at 106; *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003).

"Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated

the Constitution." *Iqbal*, 556 U.S. at 676. Therefore, a § 1983 plaintiff must allege that each defendant was personally involved in the events constituting the plaintiff's claim. *See Innis v. Wilson*, 334 F. App'x 454, 457 (3d Cir. 2009) (indicating that a § 1983 plaintiff could not maintain claims against individual defendant unless said defendant was personally involved in actions causing the claim); *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998) (stating that "[a] defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*").

Here, Laurier has sued high level administrative and supervisory officials for his injuries. In *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 316-19 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 135 S. Ct. 2042, 2043 (2015), the Third Circuit outlined "two general ways" in which a supervisor-defendant may liable under the Eighth Amendment: (1) where the supervisor established a policy, custom, or practice that caused the harm; or (2) where the supervisor personally participated in the constitutional violation.

> First, liability may attach if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). Second, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in the subordinate's unconstitutional conduct. *Id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190–91 (3d Cir. 1995)). "Failure to" claims – failure to train, failure to discipline, or, as in the case here, failure to supervise – are generally considered a subcategory of policy or practice liability.

*Id.*

With respect to the first type of claim, the Third Circuit in *Barkes* reaffirmed its four-part standard, established in *Sample v. Diecks*, for determining whether an official may be held liable

10

on a § 1983 Eighth Amendment claim for implementing deficient policies. *See id.* (citing *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989)). Under *Sample*,

> [t]o hold a supervisor liable for such an Eighth Amendment violation, the plaintiff must identify a supervisory policy or procedure that the supervisor defendant failed to implement, and prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory procedure.

766 F.3d at 330. As explained in *Barkes*, "[t]he essence of the type of claim [the Court] approved in *Sample* is that a state official, by virtue of his or her own deliberate indifference to known deficiencies in a government policy or procedure, has allowed to develop an environment where there is an unreasonable risk that a constitutional injury will occur, and that such an injury does occur." 766 F.3d at 319-20. As such, deliberate indifference in the supervisory context may be demonstrated by: "(i) showing that a supervisor failed to adequately respond to a pattern of past occurrences of injuries like the plaintiff['s] *or* (ii) by showing that the risk of constitutionally cognizable harm was 'so great and so obvious that the risk and the failure of supervisory officials to respond will alone' support the finding that the two-part test is met." *Beers-Capitol v. Whetzel*, 256 F.3d 120, 136–37 (2001) (emphasis added) (citing *Sample*, 885 F.2d at 1099).

The second type of supervisory liability outlined in *Barkes* is premised on the supervisor's personal participation in the constitutional violations *or* his or her knowledge and acquiescence in his or her subordinates' violations. 766 F.3d at 316-17. "Where a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in . . . the subordinate's conduct." *Bennett v. Washington*, No. 11-176, 2015 WL 731227, at *11 (E.D.

Pa. Feb. 19, 2015) (citing *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir.1997), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 76–78 (2007)).

Defendants contend each of Laurier's allegations implicates the knowledge and acquiesce type of supervisor liability, and requires Laurier to demonstrate D'Ilio and Defendant Robinson had contemporaneous, personal knowledge of the alleged wrongs and acquiesced them. (*See* ECF No. 29-1 at 7.) The Court disagrees. Instead, the Court construes Laurier to allege two policy claims against the supervisory Defendants and one claim based on knowledge and acquiescence. The adequacy of each claim will be discussed below.

Laurier's allegations in Counts One and Two that D'Ilio, as director of the SID, and Defendant Robinson, as chairman of the ICC, failed to create policies and/or procedures to screen and separate gay and homophobic inmates implicates the first type of supervisor liability, premised on deficient policies. Similarly, Laurier's claim in Count Three against D'Ilio is premised on his policy of allowing general population inmates to possess and use stingers without supervision or restrictions and also implicates the first type of supervisory liability and is likewise premised on a deficient policy. With respect to both claims, Laurier has sufficiently identified the deficient policies and alleged the deficient policies caused his harm. At issue for each policy claim is whether Laurier has pled sufficient facts showing that each official was "deliberate[ly] indifferent to *known* deficiencies in a government policy or procedure, [and] has allowed to develop an environment in which there is an unreasonable risk that a constitutional injury will occur, and that such an injury *does occur*." *Barkes*, 766 F.3d at 319-20.

The Court finds the Complaint does not allege that the supervisory Defendants were on notice of and failed to adequately respond to a pattern of past occurrences of injuries like Laurier's.

For example, the Complaint does not allege there have been prior instances of assaults on gay inmates by homophobic inmates at NJSP or that there is pattern of stingers being used as weapons by general population inmates at NJSP. The Complaint needs to provide facts showing "the risk of constitutionally cognizable harm was 'so great and so obvious that the risk and the failure of supervisory officials to respond will alone' support the finding that the two-part test is met." *Beers-Capitol*, 256 F.3d at 136–37 (citing *Sample*, 885 F.2d at 1118). The risk posed by failing to screen and separate homophobic and gay inmates is not "so great and so obvious" that the failure of supervisory officials to implement such a policy would support a finding that the two-part test is met.

Indeed, although the Complaint implies Inmate Robinson assaulted Laurier because he is gay, there is nothing to suggest this was anything more than an isolated occurrence. Laurier's allegations suggest as much, as Laurier's first cellmate had no issues with his sexuality. Laurier is granted leave to amend his Complaint to the extent he can provide facts demonstrating a pattern of assaults by homophobic inmates against gay inmates or other facts that would have put prison officials on notice that such a screening and separation policy was necessary. *See, e.g., Farmer*, 511 U.S. at 842-43 (explaining that actual knowledge may be inferred where "a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past"). Accordingly, Defendants' Motion to Dismiss the claim premised on the failure to screen and separate gay and homophobic inmates is **GRANTED without prejudice** as to D'Ilio and Defendant Robinson.

With respect to the deficient stinger policy, Laurier has provided some facts to suggest that the danger posed by stingers is obvious. For instance, he alleges inmates in more restrictive housing units at NJSP were not permitted by D'Ilio to use or possess stingers. (ECF No. 1 ¶ 29.)

Furthermore, inmates at other New Jersey prisons were also not permitted to have stingers during the relevant time period. (*Id.*) D'Ilio also prohibited the possession and use of commonplace items, such as pens, toothbrushes and razors (*id.*), suggesting he knew that other commonplace items could be weaponized. Finally, NJSP apparently changed its policy and stopped allowing general population inmates to possess and use stingers on or about May 15, 2014. (*Id.* ¶ 30.)

At this early stage, Lauier has pled enough facts to suggest the risk posed by NJSP's stinger policy, which did not *in any way* restrict the use of stingers by general population inmates, was obvious. Defendants contends "[Laurier] failed to produce any facts to show that D'Ilio allowed inmates to possess stingers to be used as weapons or that D'Ilio had knowledge of or acquiesced in the use of stingers for such purpose." (*Id.* at 8.) However, under the first test for supervisory liability, D'Ilio need not have allowed inmates to possess *weaponized* stingers or know and acquiesced such usage, if the dangers presented by the stingers is obvious. *Beers-Capitol*, 256 F.3d at 136–37. As set forth above, Laurier's claims regarding the stinger policy do not rely on a knowledge and acquiescence theory of liability. Instead, Laurier alleges D'Ilio created a deficient stinger policy that presented an obvious risk of harm to general population inmates and, in fact, caused Laurier's harm. Accordingly, Defendants' Motion to Dismiss is **DENIED** as to the stinger policy claim against D'Ilio.

Finally, the Court grants Defendants' Motion to Dismiss with respect to the inadequate medical care claim in Counts Five and Six against D'Ilio and Defendant Robinson, which appear to be premised on a knowledge and acquiescence theory of liability. Defendants do not contend Laurier's medical needs, *i.e.*, burns and a head wound, were insufficiently serious to warrant protection under the Eighth Amendment. Instead, they contend Laurier has failed to provide facts showing D'Ilio or Defendant Robinson knew Laurier was being denied adequate medical care and

14

acquiesced in the violation. Notably, Defendants need not personally deny Laurier's medical care. As explained above, "[w]here a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in . . . the subordinate's conduct." *Bennett,* 2015 WL 731227, at *11.

Here, Laurier alleges D'Ilio and Defendant Robinson failed to intervene in his placement of PHD status, and that placement resulted in the denial of adequate medical care. (ECF No. 1 ¶¶ 38-39.) Laurier does not allege D'Ilio and/or Defendant Robinson knew Laurier would be denied adequate medical care in PHD; nor does he allege they knew he was not having his bandages changed as directed by the hospital, or that they knew of any of the other allegedly filthy conditions in PHD. The allegation that Defendant Robinson was made aware of Laurier's "circumstances" is too vague and conclusory for the Court to credit. Accordingly, Defendants' Motion to Dismiss the inadequate medical care claim against D'Ilio and Defendant Robinson is **GRANTED**.

IV. **CONCLUSION**

For the reasons explained above, the Motion to Dismiss the official capacity claims is **DENIED** as **MOOT**. The Motion to Dismiss the Eighth Amendment claims for failing to have a policy/procedure to screen and separate homophobic and gay inmates (Counts One and Two) is **GRANTED** as to D'Ilio and Defendant Robinson. The Motion to Dismiss the Eighth Amendment claim against Defendant D'Ilio for the deficient stinger policy (Count Three) is **DENIED**. However, the Motion to Dismiss the Eighth Amendment claim for inadequate medical care as to D'Ilio and Defendant Robinson (Counts Five and Six) is **GRANTED**. The dismissals are **without prejudice**, Laurier may file an Amended Complaint within **thirty days** of his receipt of the Order accompanying this Opinion. If Laurier files an Amended Complaint within thirty days, Defendants

shall file an Answer, or otherwise respond to the Amended Complaint, within the period prescribed by Federal Rules of Civil Procedure 15.  An appropriate Order follows.


Date: January 31, 2018                                    */s/ Brian R. Martinotti*_____
                                                          HON. BRIAN R. MARTINOTTI
                                                          UNITED STATES DISTRICT JUDGE